IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

CHARLENE JORDAN,                    )
                                    )
            Plaintiff,              )
                                    )
      v.                            )      CIVIL ACTION NO. 2:11cv971-WKW
                                    )
MICHAEL J. ASTRUE,                  )
Commissioner of Social Security,    )
                                    )
            Defendant.              )

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I. Introduction**

On February 4, 2009, the plaintiff, Charlene Jordan, applied for disability insurance

benefits pursuant to Title II of the Social Security Act,  42 U.S.C. §§ 401, *et seq.*, and for

supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C.

§ 1381, *et seq.*, alleging that she was unable to work because of a disability.  Her application

was denied at the initial administrative level.  The plaintiff then requested and received a

hearing before an Administrative Law Judge ("ALJ").  Following the hearing, ALJ Katie H.

Pierce also denied the claim.  The Appeals Council rejected a subsequent request for review

on September 12, 2011.  (R. 12).  The ALJ's decision consequently became the final decision

of the Commissioner of Social Security ("Commissioner").  *See Chester v. Bowen*, 792 F.2d

129, 131 (11th Cir. 1986).  The case is now before the court for review pursuant to 42 U.S.C.

§§ 405 (g) and 1383(c)(3).  For the reasons stated below, the Magistrate Judge recommends

that the Commissioner's decision be affirmed.

## II. STANDARD OF REVIEW

Under 42 U.S.C. § 423(d)(1)(A) a person is entitled to disability benefits when the person is unable to

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . .

To make this determination[1] the Commissioner employs a five-step, sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920.

> (1)  Is the claimant presently unemployed?
> (2)  Is the claimant's impairment severe?
> (3)  Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4)  Is the claimant unable to perform his or  former occupation?
> (5)  Is the claimant unable to perform any other work within the economy?

> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled.

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[2]

The standard of review of the Commissioner's decision is a limited one.  This court must find the Commissioner's decision conclusive if it is supported by substantial evidence.

---

[1] A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

[2] *McDaniel v. Bowen,* 800 F.2d 1026 (11th Cir. 1986) is a supplemental security income case (SSI). The same sequence applies to disability insurance benefits.  *See Sullivan v. Zebley*, 493 U.S. 521, 525 n.3 (1990). Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See, e.g., Sullivan*, 493 U.S. at 525 n.3; *Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

*Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); 42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  A reviewing court may not look only to those parts of the record which supports the decision of the ALJ, but instead must view the record in its entirety and take account of evidence which detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

> [The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

## III.  ISSUES

**A.  Introduction.**    Jordan was born on February 6, 1962.  She completed school through the seventh grade.  (R. 607).  Her past work experience includes work as a gas station cashier and manager.  (R. 607-08, 136-38).  Jordan contends that she is unable to work due to low intellectual functioning, asthma, depression, and anxiety. Following the hearing, the ALJ concluded that Jordan had the following severe impairments: "borderline intellectual functioning; major depressive disorder, recurrent, mild; anxiety disorder; post traumatic stress disorder ('PTSD'); mild airways obstruction; and lumbar hypertrophy." (R. 23).  The ALJ further concluded that Jordan's impairments or combination of impairments

did not meet or medically equal one of the listed impairments in 20 C.F.R. Pt. 404, Subpt.

P, App. 1.  (R. 23-28).   The ALJ determined that Jordan had the residual functional capacity

> to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c)
> except the claimant is limited to work which will only require the claimant to:
> frequently climb ramps/stars; occasionally climb ropes/ladders/scaffolding;
> frequently balance, stoop, kneel, crouch and crawl; perform simple, routine,
> repetitive tasks; have brief superficial contact with the public; work
> independently (although the claimant can work in close proximity to others);
> adapt to minimal changes in the work setting; concentrate and maintain
> attention for up to 2 hours at a time; and have non-threatening/supportive
> supervision.  The claimant is further limited to work which will allow her to
> avoid concentrated exposure to temperature extremes, odors, gases, and/or
> fumes.

(R. 28).

The ALJ concluded that Jordan was unable to return to her past relevant work.  (R.

32).  However, the ALJ concluded that Jordan did have the residual functional capacity to

perform other jobs that exist in significant numbers in the national economy, and thus, she

was not disabled.  (R. 33).

**B.  Plaintiff's Claims.**  According to the plaintiff, the primary issues are as follows:

1.    Whether the ALJ erred in interpreting Jordan's I.Q. score in the
context of the listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1.,
§ 12.05(c);

2.    Whether the ALJ improperly discredited the opinion of Dr. Lopez, one
of Jordan's treating physicians;

3.    Whether the ALJ improperly disregarded the opinion of Jamie Abshire,
a licensed professional counselor; and

4.    Whether the vocational expert incorrectly testified that Jordan could
perform certain jobs that allegedly did not meet the residual functional

4

capacity posited by the ALJ.

(Doc. 14 p. 1).

## IV.  Discussion

**A.    The ALJ did not err at step three of the analysis in interpreting Jordan's I.Q. score in the context of the listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1., § 12.05(c).**

**1.    The ALJ's conclusion that Jordan did not meet the requirements of the opening paragraph of the listing for mental retardation was supported by substantial evidence, and the ALJ correctly applied the law in deciding this issue.**

At step three of the sequential evaluation process, the ALJ is required to determine whether the claimant's impairments meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  *McDaniel*, 800 F.2d at 1030.  Section 12.05 of Subpart P contains the listing for the impairment of mental retardation.  Jordan alleges that the ALJ erred in failing to find that she met the listing for mental retardation as defined by § 12.05(c), which provides:

> 12.05 Mental retardation.   Mental retardation refers to significantly subaverage intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrated or supports onset of the impairment before age 22.  The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied:
>
> ....
>
> C.    [The claimant has a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1., § 12.05(c).

5

Even though Jordan's IQ score fell within the range specified in §12.05(c),[3] the ALJ reasoned that Jordan did not satisfy the listing's requirements for mental retardation because she did not suffer from "significantly subaverage intellectual functioning with deficits in adaptive functioning initially manifested *during the developmental period*" *i.e.*, the evidence did not demonstrate that the onset of mental retardation occurred before age 22.  (R. 27-28);  20 C.F.R. Pt. 404, Subpt. P, App. 1., § 12.05 (Emphasis added.).  Specifically, the ALJ reasoned:

> The opening paragraph of listing 12.05 states: "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period." The undersigned notes that the Diagnostic and Statistical Manual of Mental Disorders- 4th Edition (DSM -IV),[4] states in relevant part: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning [ ] that is accompanied by significant limitations in adaptive

---

[3] Jordan argues that the ALJ erred in determining that she did not meet the listing in § 12.05(c) by failing to consider the results of her IQ test. (Doc. 14 pp. 4-5).  However, it is clear from the ALJ's opinion that she *did* fully credit the results of Jordan's IQ test, and, consistent with the results of that test, the ALJ proceeded on the assumption that Jordan's IQ fell in the 60-70 range as required to meet the mental retardation listing in §12.05(c).  *See* R. 27 (finding that Jordan did not meet the requirements of the opening paragraph of the listing for mental retardation even though she "might have met" the IQ score and other "requirements of 'paragraph C'").  Accordingly, there can be no merit to Jordan's allegation that the ALJ "erred in not using" (Doc. 14 p. 4) her IQ score.  *See Popp v. Heckler*, 779 F.2d 1497 (holding that a claimant's IQ scores alone are not conclusive evidence of mental retardation when the scores are inconsistent with the claimant's daily activities and behavior).

[4] Jordan argues that the ALJ erred by relying on the DSM-IV, which Jordan contends was out of date at the time the ALJ authored her opinion in this case.  Jordan does not explain how the most recent version of the DSM differs in any relevant way from the DSM-IV with respect to the definition of mental retardation. Further, the court has consulted the most recent available version of the DSM (the DSM-IV TR) and has determined that (with rare, inconsequential variations in word choice) it contains the same description of mental retardation as the one considered by the ALJ.  *See* http://dsm.psychiatryonline.org/book.aspx?bookid=22.  Because the definition of mental retardation is the same in both versions of the DSM, the ALJ's reliance on the DSM-IV rather than the DSM-IV TR could not constitute grounds for reversal.  *See Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (holding that the harmless error rule prevented reversal of an ALJ's decision).

functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. . . . Mental retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning . . . . Impairments in adaptive functioning, rather than a low IQ, are usually the presenting symptoms in individuals with Mental Retardation. Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." The undersigned has considered the evidence as a whole in light of the above quoted material regarding mental retardation, adaptive functioning and the eleven skill areas related to adaptive functioning. . . . The claimant has a long history of working at substantial gainful activity levels (in semi-skilled occupations), lives and functions independently, has been married, has born[e] and reared children and generally has a robust set of activities of daily living. Regarding her work history, the claimant testified that part of her past relevant work included training other employees to perform semi-skilled work. The claimant has demonstrated significant limitations the area of "functional academic skills." However, the claimant has not demonstrated a significant limitation in the other ten skill areas noted above. Because the claimant's adaptive functioning is not significantly impaired, Dr. Ghostley's diagnosis of borderline intellectual functioning is more appropriate [than a diagnosis of mental retardation]. As such, the claimant does not meet the criteria of the opening paragraph of Listing 12.05. The claimant is not mentally retarded and does not meet the severity requirements of this listing.

(R. 27-28).

Jordan argues that the ALJ should have found that she met the requirements of §

12.05(c) based on functional impairments caused by anxiety and depression that did not

occur until the alleged onset date of August 10, 2008, when Jordan was 46 years old. (Doc.

14 p. 5; R. 697). However, as the ALJ recognized, an IQ in the range of 60-70 combined

with deficits in adaptive functioning that began when a claimaint is in her 40's "might . . .

me[e]t the requirements of §12.05(c)," but these factors do not "demonstrate[] . . . the onset of the impairment before age 22" as required by the opening paragraph of the listing. (R. 27). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1., § 12.05 ("Mental retardation refers to significantly subaverage intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrated or supports onset of the impairment before age 22."); 20 C.F.R. Pt. 404, Subpt. P, App. 1., § 12.00(A.) ("If your impairment satisfies the diagnostic description in the introductory paragraph [of §12.05] *and* any one of the four sets of criteria [in §§12.05(A) through (D)], we will find that your impairment meets the listing." (Emphasis added.)). *Cf. Popp*, 779 F.2d at 1500 (noting that mental retardation denotes a lifelong condition).

Moreover, the record contains substantial evidence to support the ALJ's conclusion that Jordan did not suffer deficits in adaptive functioning that were initially manifested prior to the age of 22 as required by the opening paragraph of the listing. 20 C.F.R. Pt. 404, Subpt. P, App. 1., § 12.05. Jordan does have an extensive history of working at semi-skilled jobs after the age of 22. For example, in 1999, and also from 2003 through 2008, Jordan worked as a cashier at a gas station. (R. 136-38, 607-08). In her position as a cashier, she prepared bank deposits, operated a cash register, trained other employees, stocked coolers, did "paperwork," cleaned, and supervised three or four people "all day." (R. 138, 607-08). In 2001, Jordan worked as a filing clerk for medical records at a hospital. (R. 608). In addition, Jordan's medical records contain substantial evidence to support the conclusion that

8

she did not have sufficient deficits in adaptive functioning to demonstrate the onset of the mental retardation before the age of 22. For example, Dr. David C. Ghostley, Psy. D., a consulting clinical psychologist, diagnosed Jordan with Borderline Intellectual Functioning, not mental retardation. (R. 427). These facts, as well as the record as a whole, provide substantial evidence for the ALJ's conclusion that, despite her low IQ score, Jordan did not have the functional limitations required meet the opening paragraph of the listing for mental retardation. *Walker*, 826 F.2d at 999 ("[T]he [Commissioner]'s decision is conclusive if it is supported by substantial evidence.").

**2.     The ALJ did not err in discounting Dr. Stewart's diagnosis of mild mental retardation**

Jordan argues that the ALJ should have found that she met the listing for mental retardation on the basis of Dr. Scott Stewart's diagnosis that she was mildly mentally retarded. On August 8, 2007, the Social Security Administration's Disability Determination Unit referred Jordan to Dr. Stewart, Psy. D., who administered the Wechsler Adult Intelligence Scale - III test and observed that Jordan's Full Scale IQ score of 65 "f[ell] within the Extremely Low Range of intellectual abilities." R. 308. Dr. Stewart further stated: "This performance falls in the Mild Range of Mental Retardation. *Further review of history and records should be conducted to ascertain if a Mental Retardation diagnosis is appropriate*." (R. 308) (emphasis added). Dr. Stewart listed "Mild Mental Retardation" as his diagnostic impression. (R. 308).

On June 1, 2009, following a clinical evaluation of Jordan, Dr. Ghostley diagnosed

9

Jordan with Borderline Intellectual Functioning.  Dr. Ghostley concluded:

> Responses to mathematical and serial tasks, coupled with memory functioning, fund of information, and ability to think in abstract terms, were consistent with a level of intellectual functioning estimated to be in within the Borderline Range.
>
> ....
>
> The medical evidence of record provided by the DDS was reviewed and those findings were considered in the overall assessment of the patient.

(R. 427).

Dr. Stewart and Dr. Ghostley were both consulting medical sources who examined Jordan.  *See* 20 C.F.R.404.1527(c) (explaining "how we weigh medical opinions," including those from examining and consulting sources).  In determining that "Dr. Ghostley's diagnosis of borderline intellectual functioning is more accurate than Dr. Stewart's diagnosis of mild mental retardation," the ALJ explained: "Dr. Ghostley had the benefit of reviewing a more fully developed medical record [than did Dr. Stewart].  Dr. Ghostley also considered the claimant's activities of daily living, her social functioning, and work history.  Based upon all these factors, Dr. Ghostley's [diagnosis of] borderline intellectual functioning (rather than mental retardation) . . . is more consistent with the claimaint's overall adaptive functioning and the record as a whole." (R. 27-28).  The ALJ's decision is supported by these facts and by the record as a whole, including Dr. Stewart's own comment that "further review of history and records should be conducted to ascertain if a Mental Retardation diagnosis is appropriate." (R. 308).

The court finds no legal error in the ALJ's consideration of the underlying basis of each consultant's opinion and the extent to which those opinions were consistent with the record as a whole.  *See* 20 C.F.R.404.1527(c) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. . . . Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").  Moreover, while the ALJ properly considered medical source opinions in considering whether Jordan met the listing for mental retardation, Dr. Stewart's medical opinion was not controlling on that issue.  *See* 20 C.F.R. 404.1527 ("Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments . . . the final responsibility for deciding th[is] issue[] is reserved to the Commissioner.").

Accordingly, the ALJ's decision that Jordan did not meet the listing for mental retardation is due to be affirmed.  *Henderson ex rel. N.T. v. Astrue*, 401 Fed. Appx. 449, 450 (11th Cir. 2010) ("'[T]he ALJ is required to examine the [IQ test] results in conjunction with other medical evidence and the claimant's daily activities and behavior.' *Popp v. Heckler*, 779 F.2d 1497, 1500 (11th Cir.1986). And that is what the ALJ did in this case.").

**B.**    **The ALJ did not err in giving little weight to certain opinions of Dr. Lopez**

Jordan argues that the ALJ failed to articulate specific, justifiable reasons affording little weight to the opinion of Dr. Fernando Lopez, M.D., as expressed by Dr. Lopez on

February 22, 2010, in response to a questionnaire seeking his "medical assessment of [Jordan's] ability to do work-related activities." (R. 520). An ALJ must give substantial weight to the opinion of a treating physician unless "good cause" is shown to the contrary. *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004). "'Good cause' exists when the (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Id.* When the ALJ disregards the opinion of a treating physician, the ALJ must clearly articulate her reasons for doing so. *Id.*

Dr. Lopez treated Jordan beginning in 2009. (R. 477-86; R. 528-43). He diagnosed Jordan with major depressive disorder, recurrent, mild, and PTSD. (R. 477, 533). The ALJ clearly credited these diagnoses, as she included them among Jordan's severe impairments. (R. 23). However, the ALJ expressly stated that she did consider – but gave little weight to – Dr. Lopez's responses to the medical assessment questionnaire. (R. 520-26). As the ALJ explained:

> In addition to the medical opinions discussed earlier in this decision, the undersigned also considered the opinion of Fernando Lopez, M.D. [(R. 520-26)]. The undersigned considered this opinion at steps three, four and five of the sequential evaluation. Dr. Lopez opined the claimant has marked and extreme limitations in numerous basic work activities related to her alleged mental impairments. *Id.* This opinion is not supported by the doctor's treatment notes. This opinion is not consistent with the medical evidence as a whole. Dr. Lopez diagnosed the claimant with mild depression, which suggest[s] significantly less limitations than the limitations proposed in his opinion. [(R. 533)]. The course of treatment pursued by the doctor has not been consistent with what one would expect if the claimant were truly as limited as the doctor has reported. The claimant has never required inpatient hospitalization due to

12

her alleged mental impairments and Dr. Lopez has never suggested inpatient treatment. Dr. Lopez only saw the claimant once every 3 - 6 months and his treatment notes on those occasions do not indicate the degree of limitations suggested by his opinion. ([R. 528-43)].   This course of treatment is inconsistent with the level of impairments suggested by Dr. Lopez's opinion. This opinion is not consistent with the opinions of Dr. Stewart, Dr. Ghostley or Dr. Hinton. This opinion is not consistent with the claimant's activities of daily living or her work history. Dr. Lopez opined the claimant has suffered this debilitating level of symptoms since June 1, 2006 [(R. 522)]. This is completely inconsistent with the claimant's work history, which indicates the claimant worked at substantial gainful activity levels for approximately two years beyond that date.  [(R. 110-119).]  The possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patients requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case. The undersigned gives very little weight to this opinion.

Thus, contrary to Jordan's assertions, the ALJ *did* clearly articulate reasons why (1) Dr. Lopez's responses to the questionnaire were not supported by the evidence; (2) the evidence, the opinions of other medical sources, as well as Jordan's own work history, supported a contrary finding; and (3) Dr. Lopez's opinion was conclusory and inconsistent with his own medical records, which, the ALJ also observed, "d[id] not provide a detailed summary of [Jordan's] symptoms and/or limitations.  The notes simply indicate the claimant is struggling (generally) with depression and anxiety."  (R. 29).   These reasons constitute "good cause" for discounting Dr. Lopez's responses to the medical assessment questionnaire.

13

*See Phillips*, 357 F.3d 1232, 1240 (setting forth the conditions under which the ALJ may decline to give substantial weight to a treating physician's opinion).

The record supports the reasons given by the ALJ for discounting Dr. Lopez's opinion as to Jordan's functional limitations.  For example, as noted by the ALJ, the opinions of Drs. Stewart, Ghostley, and Hinton were not consistent with Dr. Lopez's finding of numerous marked and extreme limitations in basic work activities.  Dr. Lopez listed moderate to extreme limitations in Jordan's ability to make social adjustments and explained that Jordan "is not a social person" who "does not do well with interacting with others" (R. 521-22), but Dr. Stewart found that Jordan "appears to have the interpersonal skills required to relate to others in a work setting." (R. 308).  While Dr. Lopez found "extreme" limitation in Jordan's ability to function independently and that she was unable to manage her own benefits, (R. 520, 522), Dr. Ghostley concluded that Jordan's "ability to function independently and manage finances is unimpaired" (R. 427), and Dr. Stewart found that "the claimant appears capable of managing her own funds as she has the minimal level of general intelligence, basic skills in arithmetic, and social judgment that is consistently needed."  (R. 308). Although Dr. Lopez found moderate and marked limitations in Jordan's ability to engage in activities of daily living (R. 523-24), Dr. Hinton found only mild restriction of activities of daily living (R. 450), Dr. Ghostley stated that Jordan "requires no assistance with activities of daily living" (R. 426), and Dr. Stewart concluded that "the claimant is fully able to

manage her own activity of daily living needs." (R. 307).

Jordan also argues that, in discounting Dr. Lopez's opinion, the ALJ improperly relied on speculation as to his motives, rather than on factors that constitute "good cause" under *Philips* and other controlling cases. However, the ALJ expressly recognized that improper motives were merely a "possibility" that could not be confirmed. Taken in context, the ALJ's comments about Dr. Lopez's possible motives constitute nothing more than dicta questioning the reasons for the significant inconsistencies between Dr. Lopez's opinion and the evidence, including his own treatment notes. *See U.S. v. Kaley*, 579 F.3d 1246, 1253 n.10 (11th Cir. 2009) ("'We have defined dictum as a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding.'" (quoting *United States v. Crawley*, 837 F.2d 291, 292 (7th Cir.1988)). The ALJ did not make a factual finding as to Dr. Lopez's actual motives, and she did not rely on any such finding as grounds for discounting his opinion. Instead, the ALJ discounted Dr. Lopez's opinion because it was not bolstered by the evidence, the evidence supported a contrary finding, and his opinion was conclusory and inconsistent with his own medical records. *See Phillips*, 357 F.3d at 1240 (outlining factors that constitute "good cause" for discounting a physician's opinion). Because these reasons are supported by the evidence and they *do* constitute "good cause" for discounting Dr. Lopez's opinion, *id*., the ALJ's decision is due to be affirmed. *See Landry v. Heckler*, 782 F.2d 1551, 1551-52 (11th Cir. 1986) ("Because the factual findings made by

the Administrative Law Judge (ALJ) and adopted by the Secretary are supported by

substantial evidence in the record and because these findings do not entitle [the claimant] to

disability benefits under the appropriate legal standard, we affirm.").

**C.     The ALJ did not improperly disregard the opinion of Jamie Abshire, a licensed professional counselor.**

Jamie C. Abshire, a licensed professional counselor, treated Jordan for depression and

post traumatic stress disorder.  (R. 574).  On June 16, 2009, Abshire authored the following

letter:

> To Whom It May Concern:
>
> Charlene Jordan is a patient at this facility. She has a diagnosis of Major
> Depressive Disorder, recurrent, mild. She also has a diagnosis of Posttraumatic
> Stress Disorder. [S]he has problems with crying spells and anxiety. She has
> multiple trauma from her past. She is low functioning. She has worked in
> convenien[ce] stores for many years on and off. She now is not able to deal
> with stressors of the workplace. She needs to continue taking medication and
> attending [t]herapy on a regular basis.

(R. 574).

The ALJ gave "no special weight" to Abshire's opinion that Jordan "is not able to

handle stressors of the workplace."  *Id*.  The ALJ explained:

> To the extent that [Abshire's opinion that Jordan is not able to handle
> workplace stressors] can be interpreted as an opinion that the claimant is
> unable to work at substantial gainful activity levels, this would be an issue
> exclusively reserved to the Commissioner of this Agency. Therefore, the
> undersigned has considered this opinion, but gives it no special weight.  To the
> extent this letter can be interpreted as an opinion the claimant is limited in her
> ability to handle stress in a routine work environment, *this opinion has been*

16

*considered*. However, Mrs. Abshire is not an acceptable medical source qualified to give a medical opinion in this matter. Therefore, this opinion has not been given any special weight. Such limitations were, however, accounted for when developing the above stated residual functional capacity, which limits the claimant to work which will only require the claimant to: perform simple, routine, repetitive tasks; have brief superficial contact with the public; work independently (although the claimant can work in close proximity to others); adapt to minimal changes in the work setting; concentrate and maintain attention for up to 2 hours at a time; and have non-threatening/supportive supervision.

(R. 31-32 (emphasis added)).

Jordan  argues that the ALJ should have deferred to Abshire's opinion that her difficulties handling stress rendered her unable to work.  However, to the extent that Abshire's letter could be considered an opinion that Jordan's difficulty in handling stress renders her unable to work, the ALJ correctly declined to afford his opinion any special weight.  *See* 20 C.F.R. § 404.1527(d) (stating that dispositive issues such as whether the claimant is "unable to work," and the claimant's residual functional capacity, are "issues reserved to the Commissioner;" medical source opinions on these matters will not be given "any special significance").

Jordan also argues that the ALJ erred in declining to afford Abshire's opinion the weight due the opinion of an "acceptable medical source."  Contrary to Jordan's assertions, Abshire is not an "acceptable medical source" and his opinion is not entitled to the controlling weight due the opinion of a treating physician. *See* 20 C.F.R. 404.1513(a) (defining "acceptable medical sources"). Rather, Abshire is an "other" medical source whose

17

opinion "may" be used to show "the severity of [a claimant's] impairment(s) and how it affects [the claimant's] ability to work." 20 C.F.R. § 404.1513. From the ALJ's opinion, it is clear that she *did* consider Abshire's opinion for these purposes: specifically, in determining Jordan's residual functional capacity, the ALJ "accounted for" Abshire's opinion that Jordan "is limited in her ability to handle stress in a work environment." (R. 31-32). Accordingly, the ALJ did not commit reversible error in considering Abshire's opinion without giving it controlling weight.

**D.    The testimony of the VE constituted substantial evidence to support the ALJ's opinion.**

At the fifth and final step of the sequential analysis, the ALJ was required to determine whether Jordan was able to perform any other work within the economy. *McDaniel*, 800 F.2d at 1030. To make this determination, the ALJ consulted the opinion of a vocational expert ("VE"). *See Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999) (holding that, "[w]hen the claimant cannot perform a full range of work at a given level of exertion or the claimant has non-exertional impairments that significantly limit basic work skills," the "preferred method of demonstrating that the claimant can perform other jobs is through the testimony of a VE"). The ALJ then determined that Jordan was not disabled based on the vocational expert's testimony that Jordan "would be able to perform the requirements of representative occupations such as: poultry eviscerator (DOT Code 525.687-074), . . . microfilm document preparer (DOT 249.587-018) . . . and cafeteria worker

(DOT 311.677-010)."  (R. 33).

Jordan argues that the VE's testimony is inaccurate because, she alleges, the U.S. Department of Labor's online "O-Net" application (*see* http://www.onetonline.org/) lists these three jobs as requiring mental, physical, and social skills that are inconsistent with Jordan's residual functional capacity.  However, Jordan has offered no authority for the proposition that the ALJ must consider whether the VE's testimony is consistent with the information available from the O-Net, and the court is aware of no such authority.  The court notes that Social Security ruling (SSR 00-4p) requires the ALJ to consider whether the testimony of the VE conflicts with the Dictionary of Occupational Titles ("DOT"). Regardless of the contents of the DOT, however, the ALJ was entitled to rely on the VE's testimony that someone of Jordan's same age, education, work experience, and limitations could perform work available in the national economy, including work as a poultry eviscerator, microfilm document preparer, and cafeteria worker.  *See Jones v. Apfel*, 190 F.3d at 1229-30 (holding that an ALJ may rely on the testimony of the VE even if that testimony differs from the specifications listed in the DOT); *see also Jones v. Comm'r of Soc. Sec.*, 423 Fed. Appx. 936, 939 n.4 (11th Cir. April 19, 2011) (following *Jones v. Apfel* to hold that, "in this circuit, a VE's testimony trumps the DOT to the extent the two are inconsistent," and that a Social Security ruling (SSR 00-4p) holding to the contrary is "not binding" in this circuit). Furthermore, the ALJ discharged any arguable duty under SSR 00-4p to consider any conflict

with the DOT, which she noted in her opinion.  (R. 33 ("Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the [DOT]")). *See Jones v. Comm'r.*, 423 Fed. Appx. at 939 n.4.

Jordan also argues that the opinion of the ALJ should be reversed because the VE testified that she could perform her past job as a file clerk.  Jordan argues that she did not perform this job long enough for it to qualify as "past relevant work."  *See* 20 C.F.R. § 404.1560(b) ("We will first compare our assessment of your residual functional capacity with the physical and mental demands of your past relevant work. . . . Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it.").  However, ALJ did not rely on the VE's testimony that Jordan could perform her past job as a file clerk.  Rather, the ALJ found that Jordan *could not* perform her "past relevant work," but that she could perform other jobs in the national economy (which did not include work as a file clerk).  (R. 32-33).  Substantial evidence supports the ALJ's opinion; therefore, there is no basis to reverse the decision of the ALJ in light of the VE's testimony about Jordan's ability to perform past work as a file clerk.  42 U.S.C.A. § 405 ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]").

Jordan also argues that the ALJ's hypothetical to the VE did not include all of her mental and physical limitations because it did not incorporate the extreme limitations

indicated by Dr. Lopez's responses to the medical assessment questionnaire.  (R. 520).  *See Jones v. Apfel*, 190 F.3d at 1229 ("In order for a VE's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments.").  However, as discussed above, the ALJ's decision to discount Dr. Lopez's responses to the medical assessment questionnaire was supported by substantial evidence; therefore, the ALJ was not required to present a hypothetical that incorporated the limitations indicated Dr. Lopez.  *See id*.

## V. Conclusion

Accordingly, it is the **RECOMMENDATION** of the Magistrate Judge that the decision of the Commissioner be **AFFIRMED** and that this case be **DISMISSED**.

It is further

**ORDERED** that the parties are **DIRECTED** to file any objections to the Recommendation on or before December 26, 2012. Any objections filed must clearly identify the findings in the Magistrate Judge's Recommendation to which a party objects. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to.  Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the

Magistrate Judge's report shall bar the party from a de novo determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir.1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir.1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 11th day of December, 2012.

_____/s/Charles S. Coody_____
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE